IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ELENA BIANCO | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| GMAC MORTGAGE | : | NO. 07-4650 |
| CORPORATION, et al. | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                                                 **NOVEMBER 25, 2008**

Presently before the Court is Defendant GMAC Mortgage Corporation's ("GMAC") Motion for Summary Judgment. For the reasons set forth below, the Motion will be granted.

**I.      FACTS**

Plaintiff Elena Bianco ("Bianco") began working as an administrative assistant in the legal department of GMAC's Horsham, Pennsylvania office in May 2005. At the time she was hired, Sharon Leonard ("Leonard") was employed as Bianco's supervisor. Leonard supervised the administrative assistants in GMAC's legal department and reported directly to Robert Patterson ("Patterson"), who was employed as General Counsel for the company. The record indicates that Leonard became unhappy with Bianco's performance early on in Bianco's career at GMAC. Leonard submits that she had to meet with Bianco as early as October 2005 to address Bianco's tardiness and time management issues. (App. Mot. Summ. J., Ex. 3.)

On October 24, 2005, Anne Janiczek ("Janiczek") assumed Leonard's role in supervising the administrative assistants in the legal department. In February 2006, Janiczek conducted a performance evaluation of the administrative assistants, wherein Bianco was reviewed in all

categories as meeting or exceeding expectations.  (Janiczek Dep. 22:18-29:24, July 9, 2008.) Nonetheless, an email dated March 29, 2006, reveals that Janiczek had been receiving complaints from the attorneys whom Bianco supported concerning Bianco's failure to complete her filing, and that Janiczek informed Bianco of the complaints as of that date.  (App. Mot. Summ. J., Ex. 5.) In another email dated May 1, 2006, Janiczek again warned Bianco that her lateness in arriving to work continued to be a problem.  (App. Mot. Summ. J., Ex. 9.)

Around this same time in May 2006, Bianco asserts that she began experiencing health problems, including sores and lesions, chronic fatigue, joint pain, muscle pain, muscle weakness, lack of energy, fibers on the skin and hair, hair loss and hair breakage, stinging and biting sensations on her skin, and extreme anxiety.  (Bianco Dep. 24:1-18, June 24, 2008.)  Bianco asserts that she consulted and treated with many doctors in the hope of finding a diagnosis and cure.  However, as of the date that she was terminated from her position, she had been diagnosed only with reddened itchy skin in the form of a rash, dermatitis and seborrhea of the scalp, brittle hair and alopecia, fatigue, and an insect bite.[1]

Bianco asserts that she had conversations with both Leonard and Janiczek concerning her condition because her doctor's visits were causing her to miss time from work.  Janiczek testified that she did not specifically remember how many conversations she had with Bianco concerning her condition, but that, as far as she understood, Bianco believed she was suffering from an allergic reaction that was causing some hair loss, as well as spots and sores on her skin.  (Janiczek Dep. 39:5-21.)  Leonard testified that she recalls only one conversation, wherein Bianco informed

---

[1] Bianco indicated in her deposition that a doctor at Temple University, as well as a Dr. Kelly at the Woodman's Healing and Research Center, both feel that her symptoms point to Morgellan's Disease.  (Bianco Dep. 108:6-24.)  However, neither doctor has diagnosed Bianco with Morgellan's Disease.  (Id.)

her that she had been experiencing hair loss and that she was seeing doctors to ascertain its cause. (Leonard Dep. 37:13-38:12.)  Bianco, on the other hand, asserts that she apprised Leonard of her full range of symptoms, and that Leonard even suggested that Bianco should see Leonard's doctor.  (Bianco Dep. 80:12-24.)  Nevertheless, Bianco testified that she never requested an accommodation for her condition, and that at no time was she ever unable to perform her job.  (Id. at 24:19-25:1; 111:20-112:9; 121:3-122:1.)

On December 11, 2006, Leonard, who had resumed supervisory duties over the administrative assistants in October 2006, placed Bianco on an Action Plan.  Leonard and Lori Wertman ("Wertman"), a Human Resources consultant, met with Bianco on December 11, 2006 to discuss why it had become necessary to place Bianco on an Action Plan ("Action Plan meeting").  In the Action Plan itself, Leonard identifies conversations that she had with Bianco on October 17, 2006, October 30, 2006, November 17, 2006, and November 27, 2006, concerning Bianco's tardiness and time management issues.  (App. Mot. Summ. J., Ex. 14.)  Leonard testified in her deposition that she felt compelled to present Bianco with an Action Plan because Bianco's problems with tardiness and time management persisted despite numerous attempts to speak with Bianco and resolve these issues.  (Leonard Dep. 30:20-31:7.)

On January 8, 2007, Bianco submitted a rebuttal to the Action Plan to Lori Wertman via email.  (App. Mot. Summ. J., Ex. 17.)  In her rebuttal, Bianco admitted that she had had problems with tardiness, but otherwise objected to the characterizations of her job performance as put forth in the Action Plan.  She also stated that, during the Action Plan meeting of December 11, 2006, she felt that her sickness was being held against her.  As evidence of such, she alleged that Leonard made certain comments to her regarding her illness during the Action Plan meeting.

Specifically, she alleged that Leonard said: "What you have is not life threatening," and "You don't have cancer." (Id. at D0030.) As further evidence that Leonard was holding her illness against her, Bianco identified an instance where Leonard questioned her concerning an appointment she had at Temple University Hospital and stated that Leonard allegedly asked why she could not have chosen an appointment earlier in the day or a later point in the year. (Id.) Additionally, she noted that she learned of the FMLA after she was presented with the Action Plan, and questioned why Leonard, as her supervisor, had not advised her about the possibility of FMLA leave. (Id. at D0028.)

On January 11, 2007, Bianco again emailed Wertman and asked her to set up a meeting with Patterson, pursuant to GMAC's "open door" policy. (App. Pl.'s Resp., Ex. Q, D1067.) Wertman responded that she would set up the meeting with Mr. Patterson and also asked Bianco to "confirm that during our meeting on Tuesday, you indicated that you do not feel that you are being discriminated against due to your medical issues. Also during that meeting, I communicated that if you felt you were being discriminated against, that I would conduct an investigation into your concerns. You again stated that you do not feel you are being discriminated against." (Id.) Bianco did not respond to this email. Because she was laid off on January 16, 2007, the meeting with Patterson never occurred.

GMAC asserts that Bianco was laid off as part of a company-wide reduction-in-force ("RIF"), which was instituted in November 2006, with the aim of eliminating as many positions as possible in an effort to reduce costs throughout the company. As part of the RIF, Patterson was asked to create a contingency plan, outlining the positions that would be eliminated within the legal department. In December 2006, he was asked to submit a list of employees that would be

laid off in January 2007. Patterson identified three positions to be eliminated, one of which was that of Ms. Bianco. Importantly, he testified that he had no knowledge of Bianco's health problems when he made the decision to include her in the RIF. (Patterson Dep. 76:9-77:8, July 9, 2008.) He explained that, in deciding who would ultimately be laid off, he based his decision on input that he received from individuals that the administrative assistants supported, as well as his own overall knowledge of the administrative assistants' performance reviews. (Id. at 56:6-66:12.) Ultimately, he decided that Bianco would be included in the RIF, and she was subsequently laid off on January 16, 2007.

On November 5, 2007, Bianco filed a Complaint against GMAC in this Court. Count I of Bianco's Complaint alleges that GMAC failed to provide reasonable accommodations,[2] and engaged in unlawful discrimination and retaliation in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 ("ADA"). In Count II, she alleges unlawful discrimination and/or retaliation in violation of the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951 ("PHRA"). Count III sets forth claims for unlawful discrimination and/or retaliation and interference with her rights under the Family Medical Leave Act, 29 U.S.C. § 2601 ("FMLA").

**II.   STANDARD OF REVIEW**

"Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.'" Hines v. Consol. Rail Corp., 926 F.2d

---

[2] Bianco does not address an accommodation claim anywhere in her Answer to Defendants' Motion for Summary Judgment. Furthermore, she has openly admitted that she never asked for, nor needed, an accommodation because of her condition. (Bianco Dep. 119:22-120:5.) As such, we grant summary judgment with regard to any claim alleging that GMAC failed to provide her a reasonable accommodation.

262, 267 (3d Cir. 1991). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362 (3d Cir. 1992). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998), aff'd, 172 F.3d 40 (3d Cir. 1998).

Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates that there is a genuine issue of fact requiring a trial. See Big Apple BMW, 974 F.2d at 1362-63. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

**III.   DISCUSSION**

                      **A. Disability Discrimination Under the ADA and PHRA**

      i.        Actual Disability

The ADA prohibits employers from discriminating against individuals with disabilities

with regard to certain employment-based decisions. 42 U.S.C. § 12112(a). The PHRA makes it unlawful "[f]or any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability . . . to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required." 43 Pa. Cons. Stat. § 955(a). Courts within the Third Circuit treat PHRA claims as coextensive with claims brought under the ADA. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995). As such, it is appropriate to analyze these two claims together under the same standard. Kelly, 94 F.3d at 105.

Claims brought under the ADA and the PHRA require application of the burden-shifting framework pronounced by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The analysis under McDonnell Douglas is three-fold. First, the plaintiff must establish a prima facie case of discrimination. Id. If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. Finally, once the employer has advanced a nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons asserted by the employer were pretext, and that the employer's actions were actually motivated by discrimination. Id. at 804. As such, we must first consider whether Bianco has established a prima facie case of disability discrimination.

To establish a prima facie case of disability discrimination, a plaintiff must demonstrate

that: 1) she has a disability as defined by the ADA; 2) she is otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and 3) she suffered an adverse employment decision as a result of the discrimination.  Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998).  A plaintiff has a "disability" for purposes of the ADA if she (1) has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"; (2) has "a record of such impairment"; or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g).  The Code of Federal Regulations has defined "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). However, it is clear that there is no exhaustive list of activities which qualify as "major life activities" for purposes of the ADA.  Rather, the determination must be made on a "case-by-case" basis.  Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198 (2002); Tice v. Ctr. Area Trans. Auth., 247 F.3d 506, 513 n.5 (3d Cir. 2001).  Furthermore, the Supreme Court has made clear that these provisions "need to be interpreted strictly to create a demanding standard for qualifying as disabled" under the ADA.  Toyota Motor, 534 U.S. at 197.  The burden of establishing disability remains with the plaintiff at all times, and the plaintiff must come forward with specific evidence in the record establishing that she is substantially limited in a major life activity in order to survive a motion for summary judgment.  Marinelli v. Erie, 216 F.3d 354, 363 (3d. Cir. 2000).

      We find that Bianco has failed to establish a prima facie case of disability discrimination because she has not proven that she is disabled, as that term is defined in the ADA.  As noted above, in order to prove disability, Bianco must point to specific evidence that she suffered from a condition that substantially limited her in the performance of a major life activity.  While Bianco

has carefully laid out the symptoms resulting from her condition, she has failed to articulate how those symptoms substantially limited her in a major life activity, other than to say that they caused her to miss time from work because of doctor's appointments. Courts have explicitly determined that a recitation of symptoms, without more, is insufficient to prove disability. See Tice, 247 F.3d at 513 n.5 (citing Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566 (1999)). Thus, while Bianco states that she suffered from sores and lesions, chronic fatigue, joint pain, muscle pain, muscle weakness, lack of energy, fibers on the skin and hair, hair loss and hair breakage, stinging and biting sensations on her skin, and extreme anxiety (Bianco Dep. 24:1-18), this alone, without evidence that these symptoms were substantially limiting to a major life activity, does not establish that she was disabled.

    Even assuming Bianco intends to assert that she was substantially limited in the major life activity of working, Bianco admits, by her testimony, that she was not limited in her ability to work. In order to prove disability based on impairment of the major life activity of working, Bianco must demonstrate that she was substantially limited in performing not just her own job, but a "broad range of jobs." Tice, 247 F.3d at 512 (citing Sutton v. United Air Lines, 527 U.S. 471, 491 (1999)). However, when asked how her disability affected her ability to perform her job in the "ADA Intake Questionnaire" that she submitted to the EEOC, Bianco responded, "It does not affect my ability to perform my job." (See App. Mot. Summ. J., Ex. 13.) Furthermore, at numerous points in her deposition testimony, Bianco readily admitted that her condition did not affect her ability to perform her job. Specifically, Bianco testified as follows:

> Q. Did you feel physically able to work after you were laid off in January 2007?
> A. I had good days and bad days. I felt that, yes, I could hold a

9

>   position such as the same type of position in an office setting,
>   because that's a sitting-down position.  And I was doing it while I
>   was working there.  I was able to do it. Yes.

(Bianco Dep. 24:19-25:1.)

>   Q. I think you testified earlier, and let me know if I'm wrong, that you were always
>   able to work in a full-time capacity even with these illnesses that you've described;
>   is that correct?
>   A. I did work in a full-time capacity –
>   Q. You were –
>   A. – while I was experiencing these symptoms.
>   Q. You were able to do so even after your employment ended?
>   A. Well, I was –
>   Q. You were out of work, but you –
>   A. I was out of work.
>   – were physically able to work.
>   A. I thought so.

(Id. at 111:20-112:9.)

>   Q. Did any of your doctors ever advise you to take a leave of absence?
>   A. I don't recall.
>   ...
>   Q. Would you have followed their advice if they had asked you to?
>   ...
>   A. No, I wouldn't have.
>   Q. You –
>   A. At that time, no.
>   Q. You –
>   A. At that particular time, no, I would not have followed their – I mean, I would not
>   – I don't – I don't think it was that – I was still able to go to work everyday.  I was –
>   I was showing up for work and I was working,
>   Q. So you –
>   A. So, no, I don't think it was necessary at that point.

(Id. at 121:3-122:1.)

Because she has failed to present evidence that she was substantially limited in the performance of a major life activity, this Court finds that Bianco has failed to establish that she was disabled for purposes of the ADA.  As she cannot establish the first element of her prima facie case, her claim for disability discrimination fails.

    ii.    <u>Regarded-As Disability</u>

Alternatively, Bianco could establish disability even if she was not limited in a major life activity if she can point to evidence that her employer "regarded" her as disabled. An individual is regarded as having a disability if she: (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has none of the impairments defined in paragraph (h) (1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment. 29 C.F.R. § 1630.2(l).

However, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." Kelly, 94 F.3d at 109. Rather, an employee must show that the employer regarded her as suffering from an impairment within the meaning of the ADA. Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 381 (3d Cir. 2002). In other words, a plaintiff must show that she was regarded as being substantially limited in the performance of a major life activity. Where, as here, a plaintiff "is attempting to establish that the employer believed the individual to be limited in the life activity of 'working,' then 'working' must encompass a broad class of jobs." 29 C.F.R § 1630.2(j)(3)(l); Tice, 247 F.3d at 514. As such, in order for her "regarded as" disability claim to survive, Bianco must show that her employer regarded her condition as precluding her from performing a broad class of jobs.

A review of the record reveals that Bianco has simply not produced evidence that anyone at GMAC regarded her as disabled. Patterson, who ultimately made the decision to include Bianco in the RIF, testified that he was not even aware that Bianco had any health issues at the time he made

11

his decision. (Patterson Dep. 76:9-77:8.) Furthermore, Leonard testified that she was aware only that Bianco was suffering from hair loss. (Leonard Dep. 37:13-38:12.) While Bianco contends that she had conversations with Leonard wherein she reiterated her symptoms in their entirety, Leonard's simple awareness of her symptoms still would not establish that she regarded Bianco as disabled. Bianco has not pointed to any evidence that Leonard regarded her as unable to perform her job. In fact, Leonard testified that she did not feel that Bianco's condition interfered with her ability to perform her job. (Leonard Dep. 109:11-19.) Additionally, the fact that Leonard continually reprimanded Bianco because of her performance deficiencies and later issued an Action Plan to help cure these perceived deficiencies, suggests that Leonard expected that Bianco could and should perform the demands of the job successfully. As such, this Court will grant summary judgment with respect to this claim.

### B. Retaliation under the ADA and PHRA

In addition to her claims for discrimination, Bianco asserts claims for retaliation under the ADA and PHRA. To establish a prima facie case of retaliation, a plaintiff must show that (1) she was engaged in a protected activity; (2) there was an adverse employment action by the employer either after or contemporaneously with the employee's protected activity; and (3) there is a causal link between the protected activity and the employer's adverse action. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). If Bianco succeeds in establishing a prima facie case of discriminatory retaliation, then the analysis proceeds under the framework of McDonnell Douglas, as discussed above. We assume, arguendo, that Bianco engaged in a protected activity when she filed her rebuttal to the Action Plan. Also, as she was ultimately terminated from her position, we assume that she suffered an adverse employment action. However, with regard to the third element

of her prima facie case, we find that Bianco has failed to establish a causal connection between her protected activity and the adverse employment action.

While temporal proximity between the protected activity and the adverse employment action is circumstantial evidence of causation, absent "unusually suggestive facts," temporal proximity, without more, is insufficient to establish causation. Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1989); Tahiliani v. Bayer Corp., 170 Fed. Appx. 215, 217 (3d Cir. 2006). While the temporal proximity here weighs in Bianco's favor in that she was terminated only eight days after she filed her rebuttal,[3] Patterson's decision to include Bianco in the RIF was made before Bianco engaged in any protected activity.[4] Furthermore, Patterson testified that, at the time of his decision to include Bianco in the RIF, he had no knowledge either that Bianco was experiencing health problems or that she had complained of being discriminated against as a result of those health problems. (Patterson Dep. 76:9-77:8)  In fact, Patterson's decision to include Bianco in the RIF took place even before Leonard placed Bianco on the Action Plan. It follows logically that Patterson could not have been seeking to retaliate against Bianco for actions about which he had no knowledge. As such, we find that Bianco has failed to establish a causal link between a protected activity and the ultimate adverse employment action.

We also note that, even assuming that Bianco had established a prima facie case of disability retaliation, her claim would fail under the McDonnell Douglas framework. GMAC has

---

[3] Bianco submitted her rebuttal on January 8, 2007.  She was ultimately laid off on January 16, 2007.

[4] Patterson testified that he decided to include Bianco in the RIF in December 2006.  (Patterson Statement ¶ 6.)  Bianco did not file her rebuttal to the Action Plan until January 8, 2007.

pointed to a company-wide reduction-in-force as its reason for terminating Bianco's employment. As it has advanced a legitimate, nondiscriminatory reason for its actions, the burden shifts back to Bianco to show that that reason was actually pretext for discrimination. Bianco has failed to meet this burden. She has pointed to no evidence that would call the legitimacy of GMAC's actions into question, other than to illustrate the poor relationship between herself and Leonard, and to elude to the fact that the elimination of her position would not have reduced costs in the legal department by 5%, as required under the RIF. Nonetheless, it was Patterson, not Leonard, who ultimately decided to terminate Bianco's position. Furthermore, the evidence shows that Patterson decided to include Bianco in the RIF before he was even aware of her medical issues, and even before she was issued the Action Plan. Numerous courts have held that knowledge of the protected activity on the part of the decision-maker is a necessary prerequisite for a claim of retaliation. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 415 (3d Cir. 1999); Allen v. Nat'l R.R. Passenger Corp., No. 03-3497, 2005 WL 2179009, at *12 (E.D. Pa. Sept. 6, 2005); Carmody v. Penn. State Univ., No. 05-1645, 2007 WL 1074862, at *8 (M.D. Pa. Apr. 9, 2007) (citing Krouse v. Am. Sterilizer, Co., 126 F.3d 494, 505 (3d Cir. 1997). Additionally, it is not for this Court to determine the legitimacy of GMAC's business decisions. See Kelly, 94 F.3d at 109 (finding it inappropriate for the court to "second guess" management's decision to institute a reduction-in-force). While it is the job of the court to consider whether an employer has discriminated against an employee through a reduction-in-force, it is the decision of the management, and not the court, to determine whether a reduction-in-force is warranted in the first place. See id. As such, Bianco's retaliation claims cannot survive

summary judgment.[5]

## C. Interference and Retaliation under the FMLA

The FMLA provides eligible employees with the right to take up to 12 work-weeks of leave during a 12-month period for a serious health condition. 29 U.S.C. § 2612(a)(1)(D). At the end of the leave period, the employee has the right to return to her former position or to another position at the equivalent level. 29 U.S.C. § 2614(a)(1). The Act contains "two relatively distinct types of provisions." Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005). First, "it creates a series of prescriptive substantive rights for eligible employees, often referred to as the 'entitlement' or 'interference' provisions which set floors for employer conduct." Id. In addition, "the FMLA provides protection against discrimination based on the exercise of these rights, often referred to as the 'discrimination' or 'retaliation' provisions." Id. To set forth a claim that an employer has unlawfully interfered with the exercise of an employee's rights under the FMLA, the employee must show that she was entitled to benefits under the FMLA and that she was denied them. Id. "Courts have refused to recognize a valid claim for interference in the absence of any injury." Alifano v. Merck & Co., Inc.,175 F. Supp. 2d 792, 794 (E.D. Pa. 2001). As such, to state a claim for interference, a plaintiff must demonstrate that the employer's interference caused her to forfeit her FMLA protections. Id.

Here, the "gist" of Bianco's FMLA claims is that she was terminated after she became ill, after she exhausted her PTO time, and after she conducted discussions regarding the availability of

---

[5]In support of her claim for retaliation, Bianco also asserts that GMAC retaliated against her by failing to pay her a discretionary bonus. Patterson testified that no discretionary bonuses were paid out to any employee in the legal department in 2007 for calendar year 2006. (Patterson Dep. 80:10-24.) Bianco has presented no evidence to suggest that this was not, in fact, the case. Therefore, we do not find that GMAC's failure to pay Bianco a discretionary bonus was done in retaliation for her refusal to sign the Separation Agreement and General Release, nor do we find it was done in retaliation for her filing of a claim with the EEOC.

FMLA leave during a meeting with Leonard and Wertman on January 9, 2007.  (Pl.'s Answer Mot. Summ. J. 18.)  These facts do not establish a claim for interference under the FMLA.  First, assuming that Bianco is entitled to protection under the FMLA, she has failed to demonstrate how anyone at GMAC interfered with her FMLA rights, and furthermore, has failed to show that she suffered any harm or prejudice as a result of this alleged interference.  The only evidence she provides with regard to her FMLA claims is that, at some point in time, she contacted another department within GMAC and was advised to speak with her supervisor and/or Human Resources with regard to her rights.  (Bianco Dep. 100:1-101:23.)  However, she testified that, despite the meeting of January 9, 2007, when the subject of FMLA was being discussed, she never asked Leonard to go out on leave and never spoke with her concerning the possibility of going on leave.  (Id. at 100:15-18.)  In fact, her testimony reveals that, not only was she unsure that she actually needed FMLA leave, but that, if her doctor had suggested she go out on leave, she still would not have taken leave at that point.  (Id. at 101:19-23; 121:3-122:1.)  As she never asserted her right to FMLA leave, and even testified that she was not sure she needed it, it cannot be said that Leonard or anyone else interfered with a right that she did not assert.

Furthermore, in order to establish a prima facie case of FMLA retaliation, a plaintiff must show: (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004).  It is undisputed that Bianco never took FMLA leave.  Thus, the claim for retaliation is foreclosed on this basis alone, as she cannot establish the first element of her prima facie case.  As such, GMAC is entitled to summary judgment on all Counts.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELENA BIANCO                          :        CIVIL ACTION
                                      :
        v.                            :
                                      :
GMAC MORTGAGE                         :        NO. 07-4650
CORPORATION, et al.                   :

## ORDER

**AND NOW**, this 25th day of November, 2008, in consideration of the Motion for Summary Judgment filed by GMAC Mortgage Corporation, et al., (Doc. No. 15), and the response thereto, it is hereby **ORDERED** that the Motion for Summary Judgment is **GRANTED.**

                                BY THE COURT:


                                /s/ Robert F. Kelly
                                ROBERT F. KELLY
                                SENIOR JUDGE